**VENABLE LLP**
JEFFREY S. SABIN
XOCHITL S. STROHBEHN
CAROL LEVY-WEINER
151 West 42nd St., 49th Floor
New York, New York 10036
Telephone (212) 503-0896
Facsimile: (212) 307-5598
Email:  Jssabin@Venable.com
          XSStrohbehn@Venable.com
          CWeinerLevy@Venable.com

**MARK MIGDAL & HAYDEN**
JOSHUA MIGDAL
DAIJA P. LIFSHITZ
CHARLES GARABEDIAN
80 SW 8th St., Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440
Email:  Josh@markmigdal.com
          Daija@markmigdal.com
          Charles@markmigdal.com

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,[1]<br><br>              Reorganized Debtors. | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>(Jointly Administered) |
| CELSIUS NETWORK LLC and affiliated post-Effective Date Debtors, by and through the Blockchain Recovery Investment Consortium, LLC, acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator,<br><br>          Plaintiff,<br><br>       -against-<br><br>CHAINALYSIS, INC.,<br><br>          Defendant. | Adv. Proc. No. __-_____<br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).

Celsius Network LLC, and affiliated post-Effective Date Debtors,[2] ("Celsius," the "Company," or "Plaintiff"), by and through the Blockchain Recovery Investment Consortium, LLC ("BRIC"), acting in its capacity as the Complex Asset Recovery Manager and Litigation Administrator, by its attorneys, Mark, Migdal & Hayden and Venable LLP, files its Complaint herein against defendant Chainalysis, Inc. ("Chainalysis" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.      This adversary proceeding is about how Chainalysis knowingly and willfully fueled one of the biggest cons in cryptocurrency history, deceiving customers, propping up a sham company, and accelerating Celsius's catastrophic collapse.

2.      Celsius, founded by Alexander Mashinsky ("Mashinsky"), was a cryptocurrency company marketed as a revolutionary alternative to traditional finance and promised unprecedented benefits to its customers. But behind the scenes, it was a house of cards built on lies.

3.      When empty promises were insufficient to sustain growth, Mashinsky and other Celsius insiders (together, "Insiders") orchestrated a scheme to inflate Celsius's assets under management ("AUM") to create the illusion of financial stability, drive up demand for Celsius's native cryptocurrency (the CEL token), and secretly offload their personal holdings of CEL at sky-high prices, draining company funds in the process.

4.      Chainalysis played a central role in this deception. Under the Insiders' direction, Chainalysis and Celsius published a joint press release on December 9, 2020, falsely claiming that

---

[2] This Court appointed BRIC as Complex Asset Recovery Manager and Litigation Administrator pursuant to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 4289] (the "Plan").

Celsius held $3.31 billion AUM—when, in reality, it was nowhere near that amount ("Press Release"). The Press Release is attached hereto as Exhibit A.

5.      This was not just a mistake. Chainalysis, a supposed authority in blockchain analytics, knew the truth but willingly lent its credibility to the Insiders' lies—misleading both the public and Celsius.

6.      Chainalysis and the Insiders had a symbiotic relationship. In the nascent crypto industry, each was seeking legitimacy and market share. The Insiders relied on the credibility conferred by Chainalysis's stamp of approval to conceal their fraud, just as Chainalysis needed the prestige of aligning itself with one of the most well-known crypto lending platforms at the time to bolster its credibility and expand its client base—each had a vested interest in the association.

7.      With Chainalysis's assistance, the Insiders' scheme worked.  The result of the false and materially misleading Press Release was a massive influx of customer deposits, a skyrocketing CEL token, and the Insiders cashing out for millions.

8.      Saying Chainalysis "aided and abetted" the Insiders' fraud is like saying the engines on a jet "aid" it in taking off—it wildly downplays their essential role in the process. The joint Chainalysis-Celsius Press Release was the jet fuel that the Insiders' fraud needed.

9.      By May 2022, after months of the Celsius Insiders' systematic looting of the company, Celsius faced an $800 million deficit.  Just weeks later, the company collapsed and filed for Chapter 11 bankruptcy, leaving the company and customers devastated.

10.     This adversary proceeding seeks recovery on behalf of the Debtors in Count One and for certain customers of Celsius who contributed their claims in Counts Two through Sixteen. The claims on behalf of the Debtors and the customers who contributed their claims are inextricably intertwined and based on the same acts, misrepresentations, and omissions.

## PARTIES

11.     Celsius Network LLC was a Delaware limited liability company with a principal place of business in Hoboken, New Jersey.

12.     Celsius Network, Inc. was incorporated in Delaware and headquartered in New Jersey.

13.     Celsius Network Limited was a private limited company incorporated under the laws of England and Wales with a principal place of business in London, United Kingdom.

14.     On July 13, 2022, Celsius filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code and, pursuant to the Eleventh Notice of Filing of Plan Supplement filed in the United States Bankruptcy Court Southern District of New York, Case No. 22-10964, docket entry 4297, BRIC was appointed as the Complex Asset Recovery Manager and Litigation Administrator of Celsius and its affiliated post-Effective Date Debtors.  BRIC is a joint venture of GXD Labs LLC ("GXD Labs") and Van Eck Absolute Return Advisers Corp. ("Van Eck") and is incorporated in Delaware.  GXD Labs is incorporated in Florida and maintains its principal place of business in Florida.  Van Eck is incorporated in Delaware and maintains its principal place of business in New York.

15.     Defendant Chainalysis, Inc. is a blockchain analysis company incorporated in Delaware and headquartered in New York.

16.     On the date the Plan became effective, certain customers' ("Contributed Claimants") claims for the actions described herein were irrevocably contributed to the post-effective date Debtor for the Litigation Administrator to prosecute pursuant to Article IV.U of the Plan.

**JURISDICTION AND VENUE**

17.     This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). In the event that this or any other Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Bankruptcy Rule 7008.

19.     This Court's Findings of Fact, Conclusions of Law, and Order Confirming The Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates (the "Confirmation Order"), ECF Doc. No. 3972, in the above-captioned Chapter 11 cases, approves the Debtors' Chapter 11 plan, which, at Article XII (12), provides that this Court "shall retain exclusive jurisdiction" to "resolve any cases, controversies, suits, disputes, Causes of Action, or other matters," like this one, "that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator."

20.     This Court has personal jurisdiction over Chainalysis pursuant to Bankruptcy Rule 7004.  Chainalysis has maintained minimum contacts with the United States in connection with the claims asserted herein. Chainalysis transacted business in and maintained substantial contacts with the United States, including by maintaining relationships with United States entities, has purposefully availed itself of the privilege of doing business in the United States, and has invoked the benefits and protections of its laws. Defendant's actions were directed at, and had the intended effect of, causing injury to persons located in the United States, including in this District.

21.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced

under the Bankruptcy Code and arises in and/or is related to the underlying consolidated Chapter 11 proceeding.

22.     Plaintiff consents to the entry of final orders or judgments by the Bankruptcy Court pursuant to Bankruptcy Rule 7008.

## STATEMENT OF FACTS

### I.     CELSIUS'S CRYPTO BUSINESS AND THE CEL TOKEN

23.     Alexander Mashinsky founded Celsius in 2017, ostensibly as a platform for cryptocurrency owners to trade and maintain their assets.  Seeking to distinguish his company from traditional banking institutions, he promised to provide special benefits to Celsius account holders by paying them 80% of the gross revenue that Celsius received from its investments.

24.     Celsius offered two main services/products: (1) customers could transfer their cryptocurrency assets to Celsius in exchange for weekly interest (the Earn Program); and (2) customers could use their crypto holdings as collateral to secure low interest loans (the Borrow Program).

25.     The Insiders created a crypto token, called CEL, which was central to Celsius's business model.

26.     The premise for customers participating in the Earn Program was that (1) customers would deposit cryptocurrency assets onto Celsius's platform; (2) customers could allow Celsius to lend those assets to third parties to generate a yield; (3) Celsius would use the return on the yield to purchase CEL tokens on the open market (Celsius was to purchase the amount of CEL tokens it owed to customers as interest); (4) Celsius would pay interest in CEL tokens to customers; and (5) Celsius would in turn earn interest on the increased balances.

27.     The interest rates in the Earn Program varied depending on the type of cryptocurrency and the term of the deposit. Users were encouraged to have their interest paid out in CEL tokens by paying more than if the interest was paid in a different currency.  The more customers in the Earn Program, the more CEL tokens Celsius had to buy to fulfill its obligations to the customers.

28.     Additionally, under the Borrow Program, users who paid their loan interest in CEL tokens instead of another currency could get significantly lower interest rates.

29.     The Earn Program and Borrow Program worked hand-in-hand with Celsius's loyalty program, which encouraged users to hold more CEL in their account by unlocking perks based on holdings, for example: lower borrowing rates, higher yield on Earn accounts, and priority customer support.

30.     The initial coin offering ("ICO") for CEL took place in March 2018.  An ICO is the cryptocurrency industry's equivalent of an initial public offering of stock.  Founders of newly issued cryptocurrencies can launch an ICO as a way to raise funds from investors in exchange for selling a portion of the newly minted cryptocurrency.

31.     According to a Celsius "whitepaper," specifying CEL's structure, Celsius would initially mint 650 million CEL.  Exactly half of those tokens (325 million) were to be listed for sale to the public at between $0.20 and $0.30 per CEL.  Celsius's executive team and select employees would split 123.5 million CEL (19% of the ICO), Celsius's partners and advisors would split 26 million CEL (4% of the ICO), and the balance of CEL (27% of the ICO) would be allocated to Celsius's treasury.  The CEL whitepaper further specified that any of the 325 million CEL allocated to the public that went unsold was to be "burned," or destroyed.

32.     After the ICO, Mashinsky stated publicly that it had been fully funded and that all 325 million CEL offered to the public had been purchased.  But the ICO was not fully funded, as 117 million CEL – or 36% of the entire offering to the public – went unpurchased.  According to the whitepaper, those 117 million CEL should have been burned, but they never were.

## II.     THE SCHEME TO FRAUDULENTLY GROW THE CUSTOMER BASE

33.     In the wake of the underwhelming ICO, the Insiders orchestrated a scheme to materially misrepresent Celsius's AUM to spark customer growth through fraudulent means.

34.     The Insiders aimed to create the perception that Celsius was one of the largest cryptocurrency companies, thereby giving the illusion of sufficient liquidity to fulfill interest payments to customers and demonstrating solvency, which would instill confidence that customers' digital assets were secure.

35.      The Insiders were not doing this to benefit Celsius.  Instead, they wanted to be able to offload their CEL tokens to the public and to Celsius so that they could enrich themselves to the detriment of the public and Celsius.

36.     To execute this scheme, the Insiders needed a third party to give legitimacy to the fraudulent AUM to deceive customers, the Celsius board, and the public.  The Insiders enlisted Chainalysis.

37.     The de facto partnership between the Insiders and Chainalysis was mutually beneficial. Chainalysis was a relatively small but growing company attempting to position itself as an industry watchdog for transparency and monitoring in the crypto space—an essential service in an industry plagued by fraudulent schemes and nefarious actors.  Celsius was a large cryptocurrency company run by nefarious actors seeking public third-party validation of their fraudulent scheme.

38.     Chainalysis heavily promotes its reputation as a credible third-party investigation firm. It calls itself "the blockchain data platform." In marketing materials, it describes its business as "provid[ing] data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries."[3] It says its mission is founded on the idea that "cryptocurrency needs greater trust and transparency to realize its full potential. That's where Chainalysis comes in. We need to develop clearer regulations, establish standard audit practices, and implement powerful compliance controls…"

39.     In around 2019 and 2020, Chainalysis provided several types of software and services.  One, which Chainalysis called the "Know Your Transaction" or "KYT" software, purports to assist customers with regulatory compliance.  Another, called "Reactor," purports to enable customers to trace blockchain transactions.  The Insiders used this software, in partnership with Chainalysis, to effectuate their scheme.

40.     In October 2020, Mashinsky requested Chainalysis's assistance in using the Reactor software to engineer and publicize an "audit" of Celsius's AUM.  Chainalysis agreed.  At that time, Celsius had been operating for over two years, but it had never publicized an audit of its AUM—a critical metric for customers and others deciding whether to deposit assets with Celsius. Chainalysis agreed, and over the next weeks and months proceeded to work closely with Mashinsky and others to publicize a massive—and fraudulent—AUM figure.

41.     Celsius employee Timothy Cradle, Celsius's Head of AML [Anti Money Laundering] Monitoring, using Reactor, calculated Celsius's AUM at $1.177 billion as of November 2, 2020.  Mashinsky and the Insiders then began working to revise the methodology to come up with a larger AUM figure

---

[3] https://www.chainalysis.com/company (emphasis added).

42.     On November 9, 2020, while that process was happening, Chainalysis Co-Founder, Jonathan Levin, appeared in that capacity in a YouTube video with Mashinsky, posted on Celsius's official YouTube channel.[4] The video served as promotional material for both Chainalysis and Celsius. Levin touted Chainalysis as a key player in helping "investors who need to understand [] capital movements." He emphasized Chainalysis's ability to collect and analyze data to enhance transparency and trust in the crypto space. He further explained that Chainalysis was in a phase of expansion, describing 2020 as an inflection point for the business and emphasizing its efforts to make data more available to help people "understand that this is transparent and understand what's going on." Levin also cooperated with Mashinsky in his efforts to establish Celsius's credibility with current and prospective customers. Mashinsky tried to create the public impression that access to information, audits, and transparency were fundamental to Celsius's operations, pushing the idea that these principles ensured the platform's security and growth. But rather than provide meaningful scrutiny of Mashinsky's claims, Levin appeared to reinforce Mashinsky's narrative. For example, when Mashinsky stated that Celsius had assets worth approximately $1.6 billion, Levin acknowledged Mashinsky's comment and again highlighted Chainalysis's importance in establishing credibility.

43.     The next day, on November 10, 2020, Cradle calculated an AUM of around $2 billion.

44.     On November 11, 2020, Chainalysis received a document called "Asset Valuation Methodology," which outlined the precise steps used to calculate Celsius's AUM.  Chainalysis was also provided with the underlying data for the calculations.  On November 12, 2020,

---

[4] "MOIP [Money over IP] Interview with Jonathan Levin, Co Founder of Chainalysis," available at: https://www.youtube.com/watch?v=_4stml74RPY.

Chainalysis emailed Cradle and others at Celsius approving Cradle's calculations, calling it "accurate" and saying that "we can stand behind how [Cradle] used Reactor in his work."

45.    On November 18th, 2020, Mashinsky directed Cradle to revise the methodology to add the purported value of Celsius's trove of CEL tokens to the AUM valuation.

46.    That revision resulted in a massive increase to Celsius's AUM: from less than $2 billion to over $3.3 billion. Of that $3.3 billion figure, approximately $1.3 billion came from the CEL tokens—using highly inaccurate and misleading valuations.  Indeed, the true value of the assets Celsius actually had under management was a fraction of the $3.3 billion number. Nonetheless, that figure, and the methodology used to calculate it, were approved by Chainalysis.

47.    With the fraudulent, Chainalysis-approved AUM figure in hand, the Insiders set out on a public campaign of deception.  And, once again, they enlisted Chainalysis's assistance in that campaign—starting with the Press Release.

48.    On December 9, 2020, Celsius and Chainalysis published the joint Press Release, announcing "the completion of _an audit confirming $3,318,368,196.40 of assets by Chainalysis_." According to the Press Release, the audit was "_based on transactions, total deposits and total withdrawals_ since launch of the service in June 2018."  The Press Release boasted that the "_[t]hird-party analysis_ provides transparency with _independent verification_ and _proof of funds_ at the industry-leading cryptocurrency rewards and lending platform."

49.    Chainalysis was prominently featured in the Press Release.  It expressly stated that the so-called audit was "confirmed through Chainalysis Reactor." Chainalysis, via a quote from Chief Revenue Officer, Jason Bonds, described a two year-long relationship of "working together" with Celsius and "deploying [Chainalysis's] transaction monitoring software" before being asked "to help provide further transparency to [crypto] community by verifying the process _and accuracy_

of the information related to the net funds collected by Celsius." Bonds described the audit process as "accounting for over $7,609B in deposits and [$]4.290B in withdrawals since Celsius launched its service in June of 2018."

50.     As mentioned, these statements were materially false and misleading. The $3.31 billion figure was _not_ calculated from deposits and withdrawals as claimed by Bonds; it was actually derived via a calculation designed by Mashinsky, approved by Chainalysis, and _nowhere_ mentioned in the Press Release or otherwise to the public. Moreover, the statement from Bonds, Chainalysis's CRO, _knowingly and intentionally misled_ the public by concealing that the amount of "withdrawals" was offset by Celsius's CEL holdings and other assets. Nowhere in Bonds' statement or the Press Release was it disclosed that the true AUM figure, using accurate numbers for deposits and withdrawals, was far lower than the claimed $3.31 billion figure.

51.     Not only was Chainalysis prominently featured in the Press Release, but it had also played a direct role in drafting it.  Chainalysis received a draft of the Press Release for review and comment on November 23, 2020.  Chainalysis provided line edits back to Celsius on November 25, 2020.  On November 26, 2020, Mashinsky approved Chainalysis's edits and signed off on that draft of the Press Release.  From November 27, 2020 to December 2, 2020, Chainalysis made additional edits to the Press Release, and approved the Press Release for publication.

52.     The Press Release published on December 9, 2020, was the first time that Celsius had publicly announced that its AUM had been validated by a third party.

53.     The relationship between the Insiders and Chainalysis was symbiotic. By partnering with Celsius on the Press Release, Chainalysis substantially assisted the Insiders' scheme to lie to the public and their own company about Celsius's AUM, which was the fuel needed to fraudulently grow Celsius's customer base, creating demand for the CEL token so

Insiders could offload their CEL tokens to Celsius and the customer base at a bloated price. Chainalysis's reputation was the backbone of the Press Release. Chainalysis marketed itself as the gold standard in the crypto industry in terms of credibility as a blockchain examiner. By lending its reputation to Celsius and the so-called audit, Chainalysis vouched for and validated the liquidity and solvency of Celsius. At the time, Chainalysis was also actively trying to increase its customer base. Partnering with Celsius – one of the most prominent and well-known cryptocurrency lending platforms at the time – helped Chainalysis solidify its position in the industry as a market leader and go-to partner for all things blockchain related. The quote from Chainalysis's Bonds bragged about the two-year long relationship of the companies "working together." Celsius's large AUM made the relationship more impressive and important to Chainalysis.

54. Chainalysis knew that the stated AUM was materially false.

55. Chainalysis knew that the statement in the Press Release attributed to its Chief Revenue Officer that Celsius's "process included accounting for over $7,609B in deposits and [$]4,290B in withdrawals since Celsius launched its service in June of 2018" was materially false, in that it understated the amount of withdrawals actually calculated by Reactor.

56. Chainalysis knew that the process involved more than a simple counting of "total deposits and total withdrawals," and instead involved deposits, withdrawals, and the addition of CEL and deployment assets. At no point during its drafting or in any of its publicly released versions did the Press Release disclose that the AUM calculation included "deployed" and "held" assets.

57. Chainalysis knew that the Press Release was materially misleading, particularly in falsely suggesting that there had been an "audit," "independent verification," and "third-party verification" of the stated AUM.

58.     There was no audit.  Yet, Chainalysis approved the use of the term "audit" five times in the Press Release.

59.     Chainalysis also knew that lying about Celsius's AUM could only be motivated by a desire to fraudulently attract customers, boost CEL price, and enhance reputation to make Celsius appear more successful and stable than it actually was.

60.     Chainalysis signed off on the Press Release anyway, thereby ratifying and publicly validating every false statement therein.

## IV.     THE FALLOUT FROM THE PRESS RELEASE SCHEME

61.     The scheme worked.  Following the Press Release, customers flocked to Celsius.

**Figure 1[5]**



62.     After the Press Release, Chainalysis congratulated Celsius for the "really wide coverage" the Press Release got and the created "excitement about [Celsius's] growth."   But

---

[5]Final Report of Shoba Pillay, Examiner, *In re Celsius Network, et al.*, 22-10964, DE 1956.

Chainalysis knew that the Press Release had misled the public. Customers were calling Chainalysis about "doing other audits." On February 22, 2021, Chainalysis, in an email to Celsius, admitted that it knew the Press Release was misleading and deceptive in that it made "it seem like we [Chainalysis] conducted the audit," which "raised a lot of questions that we needed to answer." Despite having full knowledge of the impact of the Press Release, Chainalysis never corrected or updated the misstatements.

63.     The Insiders then relied upon the uncorrected misstatements, methodology and calculation "validated" by Chainalysis to publish at least three additional press releases that misrepresented Celsius's AUM and misled the world as to the true financial condition of Celsius.

64.     *First*, on January 20, 2021, the Insiders caused a press release to be published using Chainalysis's validated methodology to conclude that Celsius had $5.3 billion in AUM and 340,000 customers.[6]

65.     *Second*, on March 10, 2021, the Insiders caused a press release to be published using Chainalysis's validated methodology to conclude that Celsius had $10 billion in AUM and 485,000 customers.[7]

66.     *Third*, on August 24, 2021, the Insiders caused a press release to be published using Chainalysis's validated methodology to conclude that Celsius had $20 billion in AUM and 950,000 customers.[8]

67.     Chainalysis still failed to correct or update the misstatements. Instead, it sat idly by and enjoyed the additional publicity.

---

[6] *See Celsius crosses $5.3B in assets*, PR NEWSWIRE (Jan. 20, 2021).

[7] *See Celsius confirms over $10B in digital assets*, PR NEWSWIRE (Mar. 10, 2021).

[8] *See Celsius Network Assets are officially over $20 billion*, PR NEWSWIRE (August 24, 2021).

68.    Correspondingly, in the six months following the Press Release, CEL's price skyrocketed to over $8 per token.  As of December 10, 2020 (red box below), CEL's price was $2.21.  Within the following month, CEL's price would climb to over $6.  Less than six months later, on June 3, 2021, CEL's price rose to $8.02 per token.

**Figure 2**



69.    As more customers flocked to Celsius and the price of CEL soared post-Press Release, Celsius was required to spend more dollars each week to pay the CEL "rewards" owed to customers, which ultimately resulted in the demise of Celsius and the enrichment of the Insiders. The customers were also receiving worthless CEL tokens, which they believed had value due to the strength of Celsius's balance sheet as represented in the Press Release.

70.    To enrich themselves, the Insiders sold their personal CEL directly back to Celsius via the Company's OTC trading desk.

71.     Mashinsky sold nearly 25 million CEL tokens worth over $73 million before Celsius filed for bankruptcy, with approximately $59 million of those confirmed sales occurring in 2021, the year following the Press Release.

72.     Celsius was buying the same CEL that the Insiders were selling in a directly adversarial process where the Insiders sold CEL at a profit and Celsius bought that CEL at a loss. The self-dealing by the Insiders amounts to looting.  The Insiders undertook those actions solely for their personal benefit, thereby resulting in harm to Celsius.

73.     When the bubble driven by the Press Release burst, CEL's price plummeted, the Insiders continued selling their CEL, and by May 2022, Celsius was in a deficit of about $800 million.

74.     On June 12, 2022, Celsius paused all customer withdrawals from the platform, thereby leaving its customers with worthless CEL tokens.

75.     On July 13, 2022, Celsius filed for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

76.     On July 13, 2023, the U.S. Attorney for the Southern District of New York indicted Mashinsky on counts of securities fraud, commodities fraud, wire fraud relating to his false statements inducing customers to invest their assets in Celsius, conspiracy to manipulate the price of CEL token, a fraudulent scheme to manipulate the price of CEL token, market manipulation, and wire fraud related to CEL token manipulation.

77.     On December 3, 2024, Mashinsky pled guilty to one count of committing commodities fraud and one count of committing securities fraud in connection with two fraudulent schemes at Celsius.  In the first scheme, Mashinsky misled Celsius's customers about core aspects of the company he founded, including Celsius's success and profitability and the nature of the

investments Celsius made using customer funds.  In the second scheme, Mashinsky illicitly manipulated the price of CEL, Celsius's proprietary crypto token, while he was secretly selling his own CEL tokens at artificially inflated prices.

78.      Both of Mashinsky's schemes were made possible with Chainalysis assistance in the public announcement of the purported "audit."  As explained in Mashinsky's indictment, the Insiders orchestrated a yearslong scheme to mislead customers and market participants regarding the market value and interest in Celsius's proprietary crypto token CEL. To further the scheme to manipulate CEL, the Insiders made false and misleading public statements concerning the nature of Celsius's market activity and portraying Celsius as a safe and secure institution, which caused Celsius's customer base to grow exponentially. This was the precise role of the Press Release.

79.      Additionally, the Securities and Exchange Commission (the "SEC"), Commodity Futures Trading Commission (the "CFTC"), the Federal Trade Commission (the "FTC"), and the New York State Attorney General (the "NY AG") filed complaints against Celsius and Mashinsky, alleging that the Insiders misled investors about the financial condition of Celsius's business.  The FTC fined Celsius $4.72 billion.

## CAUSES OF ACTION

### COUNT ONE

### [Aiding and Abetting Breach of Fiduciary Duty]

80.      Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

81.      As officers and directors of Celsius, the Insiders owed Celsius fiduciary duties, including duties of care, good faith, and loyalty.

82.     The Insiders acted outside the scope of their employment and breached the fiduciary duties they owed to Celsius by, among other things, lying about Celsius's AUM to spark growth through fraudulent means to create false demand for CEL token. This fraudulent growth allowed the Insiders to increase the price of CEL for the sole purpose of personal profit while simultaneously wasting corporate resources to do so.

83.     By co-authoring the Press Release, and by validating the material misrepresentations about Celsius's AUM therein, Chainalysis provided substantial assistance to the Insiders and thereby aided and abetted their fiduciary breaches.  As detailed above, Chainalysis personnel, including senior figures like its Chief Resource Office, were directly involved in the so-called "audit" and the crafting of the Press Release every step of the way.  Chainalysis received and reviewed the false methodology and financial data underlying the Press Release, and co-authored and approved the final version of the Press Release, notwithstanding the false statements therein.

84.     The Press Release was fuel for the Insiders' scheme.  By materially misrepresenting Celsius's AUM, Chainalysis substantially assisted the Insiders' scheme to drive up demand for and artificially inflate the price of CEL, which they then sold at a premium and caused Celsius to buy at a loss.

85.     Chainalysis had actual knowledge of the breach as it had actual knowledge of the falsity of the statements in the Press Release.  As detailed above, Reactor did not calculate the AUM reported in the Press Release.  Chainalysis knew that the AUM claimed – $3.31 billion – was inaccurate and not a function of "total deposits and total withdrawals," but instead incorporated Celsius-owned CEL tokens and other encumbered assets valued at inflated prices.

86.     In the Press Release, Chainalysis is quoted describing its role as "verifying the process and accuracy of the information related to the net funds collected by Celsius." Chainalysis knew that its so-called verification was not, in fact, limited to "net funds collected by Celsius," as it additionally accounted for Celsius's CEL holdings and its deployment assets. Chainalysis knew what its mandate was, knew what the basis for the AUM calculation was supposed to be, knew about the massive discrepancy between the AUM provided to it from Reactor by Cradle on November 11, 2020 and the AUM reported in the Press Release, knew that the purported AUM reported in the Press Release included "assets" other than the customer "deposits" and "withdrawals" as identified in the Press Release, and willfully participated in misleading the public and the Company to position itself as the leading service provider in the cryptocurrency monitoring space, and (*at best* for Chainalysis) disregarded red flags and willfully blinded itself to the underlying scheme of the Insiders and the Press Release's role in furthering and concealing that scheme.

87.     Chainalysis knowingly and willfully approved the material misrepresentations in the Press Release.

88.     Chainalysis also knew that the Insiders were officers and directors of Celsius and therefore knew that they owed Celsius fiduciary duties, including the duties of care, good faith, and fair dealing. Accordingly, Chainalysis knew that the Insiders breached their fiduciary duties to Celsius by materially misrepresenting Celsius's financial condition.

89.     Chainalysis's conduct proximately caused financial harm to Celsius. The Press Release caused Celsius's customer base to fraudulently grow which in turn caused CEL's price to skyrocket due to fraudulent demand for the token so that the Insiders could profit from their manipulation of CEL by selling their CEL at an inflated price and forcing Celsius to purchase

CEL at a loss. Celsius's injury was a direct and reasonably foreseeable result of Chainalysis co-authoring and approving the Press Release in furtherance of the Insiders' fiduciary breaches.

## COUNT TWO

### [Violation of New York Deceptive Practices Act]

90.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

91.     This count is brought by Plaintiff for the consumers who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and reside in New York, as well as all other Contributed Claimants who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and who were deceived in New York or who made a transaction in New York (the "New York Consumers").

92.     The New York Consumers are "person[s]" within the meaning of New York General Business Law ("GBL") § 349.

93.     GBL § 349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state. GBL § 349(a).

94.     At all times relevant herein, Defendant was headquartered and conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

95.     The Press Release was published in New York and disseminated worldwide.

96.     Defendant violated GBL § 349 by knowingly misrepresenting and intentionally omitting material facts regarding Celsius's AUM and the procedures used to verify that AUM, as

detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by GBL § 349:

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

97.     Defendant's omission of the true characteristics of the Celsius/CEL was material to the New York Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the New York Consumers would rely on the misrepresentations, concealments, and omissions.

98.     Defendant's misrepresentations and omissions were likely to mislead, and did mislead, the New York Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the New York Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

99.    Defendant's actions were unconscionable.  The New York Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

100.    Defendant had an ongoing duty to the New York Consumers to refrain from unfair and deceptive practices under GBL § 349.   Specifically, Defendant owed the New York Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the New York Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

101.    The New York Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

102.     Plaintiff seeks an order awarding damages and any other just and proper relief available under GBL § 349, including attorney's fees.

## COUNT THREE

### [Violation of New York False Advertising Law]

103.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

104.    This count is brought by Plaintiff for the consumers who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and reside in New York , as well as all other Contributed Claimants who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and who were deceived in New York or who made a transaction in New York (the "New York Consumers").

105.    GBL § 350 prohibits false advertising in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.

106.    GBL § 350-a(1) defines the term "false advertising" as "advertising, including labeling, of a commodity, . . . if such advertising is misleading in a material respect."

107.    At all times relevant herein, Defendant was headquartered and conducted business in the State of New York or directed their business at the State of New York and are therefore subject to New York law for the incidents described in this Count.

108.    The Press Release was published in New York and disseminated worldwide.

109.    Defendant made or caused to be made and disseminated throughout the United States and around the world, through a publication, numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including the Contributed Claimants.  Numerous examples of these statements and advertisements appear throughout this Complaint.

110.    Defendant's false advertising about the characteristics of Celsius/CEL was material to the New York Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the New York Consumers would rely on the misrepresentations, concealments, and omissions.

111.    Defendant's misrepresentations and omissions were likely to mislead, and did mislead, the New York Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the New York Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

112.     Defendant's actions were unconscionable.  The New York Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

113.     Defendant had an ongoing duty to the New York Consumers to refrain from false advertising under GBL § 350.  Specifically, Defendant owed the New York Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the New York Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

114.     The New York Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

115.      Plaintiff seeks an order awarding damages and any other just and proper relief available under GBL § 350, including attorney's fees.

## COUNT FOUR

### [Violation of New Jersey's Consumer Fraud Act]

116.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

117.     This count is brought by Plaintiff for the consumers who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and reside in New Jersey , as well as all other Contributed Claimants who contributed their claims to the Litigation Administrator and who purchased or received CEL tokens after the Press Release and who were deceived in New Jersey or who made a transaction in New Jersey (the "New Jersey Consumers").

118.   At all times relevant herein, Celsius had an office or offices in the State of New Jersey. Transactions processed through Celsius's platform took place in New Jersey.

119.   Defendant and the New Jersey Consumers members are "persons" within the meaning of N.J. Stat. § 56:8-1(d).  The Press Release was an "advertisement" within the meaning of N.J. Stat. § 56:8-1(a).

120.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. § 56:8-2.

121.   Defendant violated New Jersey CFA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by New Jersey CFA :

> (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;
>
> (b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;
>
> (c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or

misrepresentation, or the concealment, suppression or omission of a material

fact with intent that others rely upon such concealment, suppression or

commission, in connection with public statements about Celsius/CEL.

122. Defendant's concealment of the true characteristics of Celsius/CEL was material to

the New Jersey Consumers, and Defendant misrepresented, concealed, or failed to disclose the

truth with the intention that the New Jersey Consumers would rely on the misrepresentations,

concealments, and omissions.

123. Defendant's misrepresentations and omissions were likely to mislead, and did

mislead, the New Jersey Consumers, who saw, read, and reasonably relied on them.  Had they

known the truth, the New Jersey Consumers would not have purchased CEL, or would have paid

significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the

promise of payment in CEL.

124. Defendant's actions were unconscionable.  The New Jersey Consumers had no way

of discerning that Defendant's representations were false and misleading, or otherwise learning

the facts that Defendant had concealed or failed to disclose.

125. Defendant had an ongoing duty to the New Jersey Consumers to refrain from unfair

and deceptive practices under New Jersey CFA.  Specifically, Defendant owed the New Jersey

Consumers a duty to disclose all the material facts concerning the audit and verification of the

AUM because it possessed exclusive knowledge, it intentionally concealed it from the New Jersey

Consumers, and/or it made misrepresentations that were rendered misleading because they were

contradicted by withheld facts.

126.    The New Jersey Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

127.    Pursuant to N.J. Stat. Ann. § 56:8-19, the Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the New Jersey CFA.

## COUNT FIVE

### [Violation of Florida's Deceptive and Unfair Trade Practices Act]

128.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

129.    This count is brought by Plaintiff for the claims assigned to it for the Florida consumers who purchased or received CEL tokens after the Press Release and reside in Florida (the "Florida Consumers").

130.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA"), prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204.

131.    Defendant violated FDUPTA by knowingly misrepresenting and intentionally omitting material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by FDUPTA:

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

132. Defendant's omissions of the true characteristics of Celsius/CEL was material to the Florida Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Florida Consumers would rely on the misrepresentations, concealments, and omissions.

133. Defendant's representations and omissions were likely to mislead, and did mislead, the Florida Consumers, who saw, read, and reasonably relied on them. Had they known the truth, the Florida Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

134. Defendant's actions were unconscionable. The Florida Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

135. Defendant had an ongoing duty to the Florida Consumers to refrain from unfair and deceptive practices under FDUTPA. Specifically, Defendant owed the Florida Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it

possessed exclusive knowledge, it intentionally concealed it from the Florida Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

136.    The Florida Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

137.    Pursuant to Fla. Stat. § 501.211(2) and §501.2105, Plaintiff seeks an order awarding damages and any other just and proper relief available under FDUPTA, including attorney's fees.

## COUNT SIX

### [Violation of California's Unfair Competition Law]

138.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

139.    This count is brought by Plaintiff for the claims assigned to it for the California consumers who purchased or received CEL tokens after the Press Release and reside in California (the "California Consumers").

140.    California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200 *et seq.*, prohibits any "unlawful, unfair, or fraudulent business act or practices."

141.    Defendant violated UCL by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by UCL:

> (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

142.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the California Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the California Consumers would rely on the misrepresentations, concealments, and omissions.

143.    Defendant's representations and omissions were likely to mislead, and did mislead, the California Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the California Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

144.    Defendant's actions were unconscionable.  The California Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

145.    The California Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

146.    Pursuant to UCL, Plaintiff seeks an order awarding damages and any other just and proper relief available, including restitution and attorney's fees.

## COUNT SEVEN

### [Violation of California's False Advertising Law]

147.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

148.    This count is brought by Plaintiff for the claims assigned to it for the California consumers who purchased or received CEL tokens after the Press Release and reside in California (the "California Consumers").

149.    Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any person, firm, corporation or association . . . to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning . . . services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

150.    Defendant made or caused to be made and disseminated throughout California and the United States, through a publication, numerous statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendant, to be untrue and misleading to consumers, including the California Consumers. Numerous examples of these statements and advertisements appear throughout this Complaint.

151.    Pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiff seeks an order awarding damages and any other just and proper relief available, including restitution and attorney's fees

## COUNT EIGHT

**[Violation of California's Consumers Legal Remedies Act]**

152.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

153.    This count is brought by Plaintiff for the claims assigned to it for the California consumers who purchased or received CEL tokens after the Press Release and reside in California (the "California Consumers").

154.    California's Consumer's Legal Remedies Act, Cal. Civ. Code §1750, *et seq.* ("CLRA"), prohibits "unfair or deceptive acts or practices" in connection with the sale of goods or services to any consumer, including (i) misrepresenting the sponsorship, approval, or certification of goods or services; (ii) misrepresenting the affiliation, connection, or association with, or certification by, another; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (iv) representing that goods or services are of a particular standard, quality, or grade, if they are of another. Cal. Civ. Code § 1770.

155.    Defendant violated CLRA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by CLRA:

> (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;
>
> (b) Misrepresenting its sponsorship, approval, or certification of Celsius's AUM;
>
> (c) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(d) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(e) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

156.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the California Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the California Consumers would rely on the misrepresentations, concealments, and omissions.

157.    Defendant's representations and omissions were likely to mislead, and did mislead, the California Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the California Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

158.    Defendant's actions were unconscionable.  The California Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

159.    The California Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

160.     Pursuant to CLRA, Plaintiff seeks an order awarding damages and any other just and proper relief available, including attorney's fees.

## COUNT NINE

### [Violation of Texas's Deceptive Trade Practices Act]

161.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

162.    This count is brought by Plaintiff for the claims assigned to it for the Texas consumers who purchased or received CEL tokens after the Press Release and reside in Texas (the "Texas Consumers").

163.    Defendant and the Texas Consumers are "persons" within the meaning of Tx. Bus. & Com. § 17.45, and the Texas Consumers are "consumers" within the meaning of Tx. Bus. & Com. § 17.45. The Press Release was published in the conduct of "trade" or "commerce" within the meaning of Tx. Bus. & Com. § 17.45.

164.    Texas's Deceptive Trade Practices-Consumer Protection Act, Tx. Bus. & Com. §17.41, *et seq.* ("Texas DTPA"), prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," including: (i) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (ii) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; (iii) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.  Tx. Bus. & Com. §17.46.  It also provides a right of action for "an unconscionable action or course of action by any person."  Tx. Bus. & Com. §17.50(a)(3).

165.    Defendant violated Texas DTPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Texas DTPA:

    (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

    (b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

    (c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    (d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

166.     Defendant's concealment of the true characteristics of Celsius/CEL was material to the Texas Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Texas Consumers would rely on the misrepresentations, concealments, and omissions.

167.     Defendant's representations and omissions were likely to mislead, and did mislead, the Texas Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the Texas Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

168.     Defendant's actions were unconscionable.  The Texas Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

169.    Defendant had an ongoing duty to the Texas Consumers to refrain from unfair and deceptive practices under Texas DTPA.  Specifically, Defendant owed the Texas Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Texas Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

170.    The Texas Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

171.    Pursuant to Tex. Bus. & Com. Code § 17.50 *et seq*., Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Texas DTPA.

172.    Defendant was provided notice of the issues raised in this Count and this Complaint, as detailed above. In addition, on March 22, 2025, a notice letter was sent on behalf of the Texas Consumers to Defendant pursuant to Tex. Bus. & Com. Code § 17.505(a). Alternatively, written notice is rendered impracticable by reason of necessity of filing suit in order to prevent the expiration of the statute of limitations.

## COUNT TEN

### [Violation of Virginia's Consumer Protection Act]

173.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

174.    This count is brought by Plaintiff for the claims assigned to it for the Virginia consumers who purchased or received CEL tokens after the Press Release and reside in Virginia (the "Virginia Consumers").

175.    The Virginia Consumer Protection Act ("Virginia CPA") prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction…" and lists prohibited practices which include: misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that goods or services are of a particular standard, quality, grade, style or model; advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised; using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. Va. Code § 59.1-200.

176.    Defendant violated Virginia CPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Virginia CPA :

  (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

  (b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

  (c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

  (d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

177.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the Virginia Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Virginia Consumers would rely on the misrepresentations, concealments, and omissions.

178.    Defendant's representations and omissions were likely to mislead, and did mislead, the Virginia Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the Virginia Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

179.    Defendant's actions were unconscionable.  The Virginia Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

180.    Defendant had an ongoing duty to the Virginia Consumers to refrain from unfair and deceptive practices under Virginia CPA.  Specifically, Defendant owed the Virginia Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Virginia Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

181.    The Virginia Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

182.    Pursuant to Va. Code § 59.1-204, Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Virginia CPA.

## COUNT ELEVEN

### [Violation of Indiana's Deceptive Consumer Sales Act]

183.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

184.    This count is brought by Plaintiff for the claims assigned to it for the Indiana consumers who purchased or received CEL tokens after the Press Release and reside in Indiana (the "Indiana Consumers").

185.    Defendant and the Indiana Consumers are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2). Defendant and Celsius were also a "supplier" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

186.    The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive act," which includes representing: that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; that the subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; that the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; any representations in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false. Ind. Code § 24-5-0.5-3.

187.    Defendant violated Indiana DCSA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Indiana DCSA :

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

188.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the Indiana Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Indiana Consumers would rely on the misrepresentations, concealments, and omissions.

189.    Defendant's representations and omissions were likely to mislead, and did mislead, the Indiana Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the Indiana Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

190.    Defendant's actions were unconscionable and incurable.  The Indiana Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

191.    Defendant had an ongoing duty to the Indiana Consumers to refrain from unfair and deceptive practices under Indiana DCSA.  Specifically, Defendant owed the Indiana Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Indiana Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

192.    The Indiana Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

193.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Indiana DCSA.

## COUNT TWELVE

### [Violation of Colorado's Consumer Protection Act]

194.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

195.    This count is brought by Plaintiff for the claims assigned to it for the Colorado consumers who purchased or received CEL tokens after the Press Release and reside in Colorado (the "Colorado Consumers").

196.    Defendant and the Colorado Consumers are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Colo. Rev. Stat. § 6-1-101,

*et seq*. The Colorado Consumers are "consumers" within the meaning of Col. Rev. Stat § 6-1-113(1)(a), and Plaintiff is a successor-in-interest to the Colorado Consumers within the meaning of Col. Rev. Stat § 6-1-113(1)(b).

197.    The Colorado CPA makes unlawful deceptive trade practices, including: knowingly or recklessly making a false representation as to the source, sponsorship, approval, or certification of goods, services, or property; knowingly or recklessly making a false representation as to affiliation, connection, or association with or certification by another; knowingly or recklessly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith; representing that goods, food, services, or property are of a particular standard, quality, or grade, if he knows or should know that they are of another; failing to disclose material information concerning goods, services, or property which information was known at the time of an advertisement if such failure to disclose such information was intended to induce the consumer to enter into a transaction; knowingly or recklessly engaging in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice

198.    Defendant violated Colorado CPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Colorado CPA.

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

199.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the Colorado Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Colorado Consumers would rely on the misrepresentations, concealments, and omissions.

200.    Defendant's representations and omissions were likely to mislead, and did mislead, the Colorado Consumers, who saw, read, and reasonably relied on them. Had they known the truth, the Colorado Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

201.    Defendant's actions were unconscionable. The Colorado Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

202.    Defendant had an ongoing duty to the Colorado Consumers to refrain from unfair and deceptive practices under Colorado CPA. Specifically, Defendant owed the Colorado Consumers a duty to disclose all the material facts concerning the audit and verification of the

AUM because it possessed exclusive knowledge, it intentionally concealed it from the Colorado Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

203.   The Colorado Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

204.   Pursuant to Colo. Rev. Code § 6-1-113, Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Colorado CPA.

## COUNT THIRTEEN

### [Violation of Washington's Consumer Protection Act]

205.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

206.   This count is brought by Plaintiff for the claims assigned to it for the Washington consumers who purchased or received CEL tokens after the Press Release and reside in Washington (the "Washington Consumers").

207.   Defendant and the Washington Consumers members are "persons" within the meaning of Rev. Code Wash. § 19.86.010(1).  Defendant was engaged in "commerce" within the meaning of Rev. Code Wash. § 19.86.010(2).

208.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Rev. Code Wash. § 19.86.020.

209.   Defendant violated Washington CPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify

that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following

unfair or deceptive acts or practices prohibited by Washington CPA:

> (a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did
> not have;
>
> (b) Representing that Celsius/CEL was of a particular standard, quality, and grade
> when it was not;
>
> (c) Engaging in other conduct which created a likelihood of confusion or of
> misunderstanding; and/or
>
> (d) Using or employing deception, fraud, false pretenses, false promise or
> misrepresentation, or the concealment, suppression or omission of a material
> fact with intent that others rely upon such concealment, suppression or
> commission, in connection with public statements about Celsius/CEL.

210.    Defendant's concealment of the true characteristics of Celsius/CEL was material to

the Washington Consumers, and Defendant misrepresented, concealed, or failed to disclose the

truth with the intention that the Washington Consumers would rely on the misrepresentations,

concealments, and omissions.

211.    Defendant's representations and omissions were likely to mislead, and did mislead,

the Washington Consumers, who saw, read, and reasonably relied on them.  Had they known the

truth, the Washington Consumers would not have purchased CEL, or would have paid significantly

less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of

payment in CEL.

212.     Defendant's actions were unconscionable.  The Washington Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

213.     Defendant had an ongoing duty to the Washington Consumers to refrain from unfair and deceptive practices under Washington CPA.  Specifically, Defendant owed the Washington Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Washington Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

214.     The Washington Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

215.     Pursuant to Rev. Code Wash. § 19.86.140 and 19.86.090, Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Washington CPA.

## COUNT FOURTEEN

### [Violation of Massachusetts' Consumer Protection Act]

216.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

217.     This count is brought by Plaintiff for the claims assigned to it for the Massachusetts consumers who purchased or received CEL tokens after the Press Release and reside in Massachusetts (the "Massachusetts Consumers").

218.   Defendant and the Massachusetts Consumers members are "persons" within the meaning of M.G.L.A. CH. 93A, § 1(a).  Defendant was engaged in "trade" and "commerce" within the meaning of M.G.L.A. CH. 93A, § 1(b).

219.   The Massachusetts Consumer Protection Act ("Massachusetts CPA") broadly prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L.A. CH. 93A, § 1.

220.   Defendant violated Massachusetts CPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Massachusetts CPA:

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

221.   Defendant's concealment of the true characteristics of Celsius/CEL was material to the Massachusetts Consumers, and Defendant misrepresented, concealed, or failed to disclose the

truth with the intention that the Massachusetts Consumers would rely on the misrepresentations, concealments, and omissions.

222.    Defendant's representations and omissions were likely to mislead, and did mislead, the Massachusetts Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the Massachusetts Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

223.    Defendant's actions were unconscionable.  The Massachusetts Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

224.    Defendant had an ongoing duty to the Massachusetts Consumers to refrain from unfair and deceptive practices under Massachusetts CPA.  Specifically, Defendant owed the Massachusetts Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Massachusetts Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

225.    The Massachusetts Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

226.    Pursuant to M.G.L.A. CH. 93A, § 9, Plaintiff seeks an order awarding damages, attorney's fees, and any other just and proper relief available under the Massachusetts CPA, including actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendant's conduct was committed willfully and

knowingly, Plaintiff is entitled to recover, for each Massachusetts Consumer, up to three times actual damages, but no less than two times actual damages.

227.    Defendant was provided notice of the issues raised in this Count and this Complaint, as detailed above. In addition, on March 22, 2025, a notice letter was sent on behalf of the Massachusetts Consumers to Defendant pursuant to M.G.L.A. CH. 93A, § 9(3).

228.    Because Defendant failed to remedy its unlawful conduct within the requisite time period, Plaintiff seeks all damages and relief to which it is entitled.

## COUNT FIFTEEN

**[Violation of North Carolina's Unfair and Deceptive Acts and Practices Act]**

229.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

230.    This count is brought by Plaintiff for the claims assigned to it for the North Carolina consumers who purchased or received CEL tokens after the Press Release and reside in North Carolina (the "North Carolina Consumers").

231.     Defendant was engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

232.    The North Carolina Unfair and Deceptive Acts and Practices Act ("NCDAPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

233.    Defendant violated NCDAPA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by NCDAPA :

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

234.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the North Carolina Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the North Carolina Consumers would rely on the misrepresentations, concealments, and omissions.

235.    Defendant's representations and omissions were likely to mislead, and did mislead, the North Carolina Consumers, who saw, read, and reasonably relied on them.  Had they known the truth, the North Carolina Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

236.    Defendant's actions were unconscionable.  The North Carolina Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

237.    Defendant had an ongoing duty to the North Carolina Consumers to refrain from unfair and deceptive practices under NCDAPA.  Specifically, Defendant owed the North Carolina Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the North Carolina Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

238.    The North Carolina Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

239.    Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the NCDAPA.

### COUNT SIXTEEN

**[Violation of Arizona's Consumer Fraud Act]**

240.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 79, which are incorporated by reference as if set forth fully herein.

241.    This count is brought by Plaintiff for the claims assigned to it for the Arizona consumers who purchased or received CEL tokens after the Press Release and reside in Arizona (the "Arizona Consumers").

242.     Defendant and the Arizona Consumers members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).  The Press Release was an "advertisement" within the meaning of Ariz. Rev. Stat. § 44-1521(1).

243.    The Arizona Consumer Fraud Act ("Arizona CFA") prohibits: "the act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false

pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

244.    Defendant violated Arizona CFA by knowingly misrepresenting and intentionally concealing material facts regarding Celsius's AUM and the procedures used to verify that AUM, as detailed above. Specifically, Defendant engaged in one or more of the following unfair or deceptive acts or practices prohibited by Arizona CFA:

(a) Representing that Celsius/CEL had characteristics, uses, or benefits that it did not have;

(b) Representing that Celsius/CEL was of a particular standard, quality, and grade when it was not;

(c) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

(d) Using or employing deception, fraud, false pretenses, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or commission, in connection with public statements about Celsius/CEL.

245.    Defendant's concealment of the true characteristics of Celsius/CEL was material to the Arizona Consumers, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Arizona Consumers would rely on the misrepresentations, concealments, and omissions.

246.    Defendant's representations and omissions were likely to mislead, and did mislead, the Arizona Consumers, who saw, read, and reasonably relied on them. Had they known the truth, the Arizona Consumers would not have purchased CEL, or would have paid significantly less for their CEL, and would not have agreed to enter into Celsius's programs on the promise of payment in CEL.

247.    Defendant's actions were unconscionable. The Arizona Consumers had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

248.    Defendant had an ongoing duty to the Arizona Consumers to refrain from unfair and deceptive practices under Arizona CFA. Specifically, Defendant owed the Arizona Consumers a duty to disclose all the material facts concerning the audit and verification of the AUM because it possessed exclusive knowledge, it intentionally concealed it from the Arizona Consumers, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

249.    The Arizona Consumers suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

250.    Plaintiff seeks an order awarding damages, treble damages, attorney's fees, and any other just and proper relief available under the Arizona CFA.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests the Court to enter a judgment and grant the following relief:

1.    A judgment against Chainalysis finding and declaring that Chainalysis aided and abetted the Insiders in breaching their fiduciary duties owed to Celsius.

2.      A judgment against Chainalysis finding and declaring that Chainalysis violated New York General Business Law § 349, *et seq.*

3.      A judgment against Chainalysis finding and declaring that Chainalysis violated New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

4.      A judgment against Chainalysis finding and declaring that Chainalysis violated Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*

5.      A judgment against Chainalysis finding and declaring that Chainalysis violated California's Unfair Competition Law, Business and Professions Code § 17200, *et seq.*

6.      A judgment against Chainalysis finding and declaring that Chainalysis violated California's False Advertising Law, Business and Professions Code § 17500.

7.      A judgment against Chainalysis finding and declaring that Chainalysis violated California's Consumer's Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*

8.      A judgment against Chainalysis finding and declaring that Chainalysis violated Texas's Deceptive Trade Practices-Consumer Protection Act, Tx. Bus. & Com. §17.41, *et seq.*

9.      A judgment against Chainalysis finding and declaring that Chainalysis violated Virginia's Consumer Protection Act, Va. Code § 59.1-200., *et seq.*

10.     A judgment against Chainalysis finding and declaring that Chainalysis violated Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1, *et seq.*

11.     A judgment against Chainalysis finding and declaring that Chainalysis violated Colorado's Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*

12.     A judgment against Chainalysis finding and declaring that Chainalysis violated Washington's Consumer Protection Act, Rev. Code Wash. § 19.86.010, *et seq.*

13.     A judgment against Chainalysis finding and declaring that Chainalysis violated Massachusetts' Consumer Protection Act, M.G.L.A. CH. 93A, § 1, *et seq.*

14.     A judgment against Chainalysis finding and declaring that Chainalysis violated North Carolina's Unfair and Deceptive Acts and Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*

15.     A judgment against Chainalysis finding and declaring that Chainalysis violated Arizona's Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq*. A judgment against Chainalysis finding and declaring that Chainalysis is liable for the full amount of damages caused by Chainalysis's participation in the Insiders' fiduciary breaches.

16.     Damages in an amount to be determined at trial.

17.     Pre-judgment and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law.

18.     Costs of suit incurred herein, including reasonable attorneys' fees, costs, and other expenses incurred in this action.

19.     Any other relief as the Court deems just, proper, or equitable.


## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Dated: New York, New York
        March 22, 2025

**VENABLE LLP**

By:    _/s/ Jeffrey S. Sabin_____
Jeffrey S. Sabin
Xochitl S. Strohbehn
Carol Levy-Weiner
151 West 42nd St., 49th Floor
New York, New York 10036
Telephone (212) 503-0896
Facsimile: (212) 307-5598
Email:  Jssabin@Venable.Com
XSStrohbehn@Venable.com
CWeinerLevy@Venable.com

**-and-**

**MARK MIGDAL & HAYDEN**
Joshua Migdal
(*pro hac vice* forthcoming)
Daija P. Lifshitz
(*pro hac vice* forthcoming)
Charles Garabedian
(*pro hac vice* forthcoming)
80 SW 8th St., Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440
Email:  Josh@markmigal.com
Daija@markmigdal.com
Charles@markmigdal.com
eservice@markmigdal.com

*Counsel to Litigation Administrator*